**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **AYANA ANDREWS, parent & next friend**<br>**of S.H., a minor,** | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **19-706 PJM** |
| | * | |
| **BOARD OF EDUCATION OF PRINCE**<br>    **GEORGE'S COUNTY** *et al.,* | * | |
| | * | |
| | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*

| | | |
|---|---|---|
| **MONICA HARLEY, parent & next friend of**<br>    **D.W., a minor,** | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **19-709 PJM** |
| | * | |
| **BOARD OF EDUCATION OF PRINCE**<br>    **GEORGE'S COUNTY** *et al.,* | * | |
| | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Plaintiffs Ayana Andrews, on behalf of S.H., a minor, and Monica Harley, on behalf of D.W., a minor, have sued the Prince George's County Board of Education ("Board") and Michelle Williams and Deonte Carraway in their official and individual capacities, based on the sexual abuse that Carraway indisputably perpetrated against the minors while he was employed as a classroom aide at Sylvania Woods Elementary School ("Woods Elementary") in Glenarden, Maryland, where Williams was and is the principal. Carraway was a paid dedicated aide at Woods Elementary during the 2014–2015 school year and an unpaid assistant there during the 2015–2016 school year.

These two cases were originally filed in the Prince George's County Circuit Court and subsequently removed to federal court.[1] Following a lengthy procedural history, on June 12, 2020, Plaintiffs in both cases filed third amended complaints, raising 11 identical claims. On June 24, the Board filed a partial motion to dismiss and motion for summary judgment in both cases.[2] After briefing on the motion concluded, the Court held oral argument on October 22, 2020.[3]  In an oral opinion rendered at the end of the motions hearing, the Court granted or denied various of the Board's claims except one: the alleged violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* The Court now considers that remaining claim. For the following reasons, the Court will deny the Board's motion for summary judgment as to the alleged Title IX violation.

## I. Background

Plaintiffs allege that, in November 2014, Principal Williams arranged for Carraway to be hired as a paid classroom assistant at Woods Elementary. Williams initially assigned Carraway to assist a student with learning disabilities (not one of the minor Plaintiffs in this case). Sometime afterwards the student allegedly complained about physical contact by Carraway, including being pinched by him, and thereafter was frequently absent from school for long periods.[4] No disciplinary action was taken against Carraway at the time.

---

[1] Several other consolidated cases pertaining to Carraway's alleged abuses remain pending before the Prince George's County Circuit Court, including three cases that this Court remanded to that court. *See* Mem. Op. (No. 19-706) (Sept. 10, 2019), ECF No. 46. Earlier this year, the state court granted summary judgment in favor of the Board as to all Title IX claims and negligent hiring claims. *See* Correspondence re. State Court Ruling (Jan. 14, 2020), ECF No. 53.

[2] The Board's motion addresses only the claims raised against the Board and against Williams in her official capacity. The claims against Williams and Carraway in their individual capacities remain pending.

[3] Plaintiffs and the Board also filed supplemental briefing on a question the Court raised at an earlier hearing regarding the applicability of the doctrine of equitable estoppel to the Title IX claim. Because the Court concludes that a factfinder could conclude that the elements of a Title IX violation have been met without reliance on the doctrine of equitable estoppel, the Court does not discuss the theory here.

[4] Plaintiffs' pleadings do not specify to whom this student complained, but Williams is not alleged to have received the complaint directly.

Carraway was one of a few paid dedicated aides let go at the end of the 2014–2015 school year, but he returned to Woods Elementary the following year as a volunteer classroom assistant. Upon Carraway's return, Williams allegedly arranged for Carraway to have a "faculty/staff" badge to wear throughout the building, giving him the appearance of official authority despite his lack of an official paid role and despite his alleged lack of qualifications.

As a volunteer aide, Carraway was initially assigned to work in two specific classrooms. The teachers of both classrooms, however, soon enough complained to Williams that Carraway was exhibiting disruptive and inappropriate behavior and indicated that they no longer wanted him in their classrooms. Nonetheless, Williams is said to have directed both teachers to continue to grant Carraway access. Eventually, Carraway was assigned to work in the school library instead of the classrooms, but Williams purportedly also continued to allow Carraway to roam the school at will and on occasion to remove students from their classrooms. Carraway apparently was not obligated to report to anyone.

As both a paid and volunteer aide, Carraway would allegedly wander in and out of classrooms and take students from their classrooms or unsuccessfully attempt to do so. His disruptions led at least two teachers (other than the two previously referenced teachers) to ban him from their classrooms and prompted other teachers to complain to Williams and to other school administrators. During his roaming, Carraway allegedly sexually abused students in school bathrooms, in a private room located behind a stage in the school cafeteria, and in the music room. On occasion he purportedly filmed the abusive incidents on his cellphone or directed students to do so. He is also said to have displayed flagrantly inappropriate behavior, including showing students photos and videos while in classrooms, skipping through hallways, frequently wearing pajamas to the school, and in general acting in childlike fashion. On at least one occasion,

Carraway was observed making an inappropriate dance move with students and posted a video of it online, which was later taken down.

Despite Carraway's peculiar behavior occurring openly throughout the school, and despite the alleged sexual abuse occurring in less open settings (not necessarily explicitly reported to Williams at the time), Williams and other school administrators still allowed Carraway unrestricted access to school property. He assisted at after-school basketball games, was allowed to act as a chaperone on an overnight fieldtrip for students in October 2015, was permitted to serve as a substitute teacher in January 2016, and was assigned to walk students home from school every day. This purportedly allowed Carraway to commit further abuse of unsupervised children in their homes, while claiming to run an after-school "tutoring" program called "GYG." He also allegedly started a "male mentoring group," which he used to create further opportunities to sexually abuse boys at the school.

Beginning in October 2014, Carraway also directed a choir not affiliated with the school called City of Glenarden Voices of Youth Choir. In connection with this activity, he allegedly used school resources to create and print recruitment flyers for the choir and distributed them to students during the school day. The choir practiced at the Glenarden Municipal Center, where Carraway further abused children, including S.H., reportedly recording the abuse. Carraway also allegedly coerced students in the choir to engage in sex acts so that they could become part of his so-called "AKA Club."

### A.  Plaintiffs' Allegations

Plaintiffs make numerous allegations of sexual abuse by Carraway committed in multiple locations. S.H. alleges at least a dozen instances of abuse between September 2015 and January 2016, none of which were reported to authority figures at the school. Third Am. Compl. ¶¶ 115–

25 (June 12, 2020), ECF No. 71.[5] The alleged abuse included showing S.H. sexually explicit videos; showing him videos of other students engaging in sexual acts with Carraway and with each other; and coercing S.H. and other students into engaging in sexual acts with each other, sometimes while Carraway recorded the abuse on his cellphone. *Id.* Most of the alleged occurrences took place at the Glenarden Municipal Center or at students' homes, but at least two took place on school grounds: in mid-January 2016, in the school hallway, Carraway showed S.H. a video of two students engaging in sexual acts in the school cafeteria, *id.* ¶ 124; and in late January 2016, in the Woods Elementary cafeteria, Carraway showed S.H. two sexually explicit videos, *id.* ¶ 125.

D.W. alleges at least five specific instances of abuse by Carraway, four of which took place at Woods Elementary. Third Am. Compl. ¶¶ 107–12 (No. 19-709) (June 12, 2020), ECF No. 63. In December 2015 or January 2016, Carraway removed D.W. from class, escorted him to the cafeteria, and forced him to engage in sexual acts with Carraway, while Carraway filmed the abuse on his cellphone. *Id.* ¶ 107. During the same time period, Carraway again removed D.W. from class, escorted him to the cafeteria, and forced him and another student to engage in sexual acts with each other, while Carraway directed and recorded them. *Id.* ¶ 108. D.W. allegedly reported the latter incident to Clarence Dixon, a counselor at Woods Elementary. *See* D.W. Police Int., Ex. 21 (No. 19-709), ECF No. 72-22. In January or early February 2016, during school hours, Carraway gave D.W. a cellphone and enticed him to go to the bathroom and take sexually explicit photos of himself. Third Am. Compl. ¶ 111 (No. 19-709). In addition, on an unspecified date during the 2015–2016 school year, Carraway removed D.W. from class, took him to the bathroom with three other students, and directed one student to perform oral sex on D.W. and record it. *Id.*

---

[5] All ECF numbers refer to the docket in case number 19-706 unless otherwise indicated.

¶ 112. While D.W. and the other student went into the bathroom, they did not in fact engage in the requested act. *Id.*

### B.  Reports of Carraway's Behavior by Students Other Than Plaintiffs

Teachers, counselors, and administrators at Woods Elementary allegedly received more than a dozen reports about Carraway's behavior during the 2014–2015 and 2015–2016 school years.[6] Some of the alleged reports pertained to Carraway's general immaturity, but at least half alleged some kind of sexual abuse. These include numerous alleged reports to teachers and guidance counselors.

In the 2014–2015 school year, a fifth-grader allegedly told a teacher that Carraway had attempted "to show [the student] an inappropriate video," Opp'n to Mot. to Dismiss and Mot. for Summ. J. at 9 (July 8, 2020), ECF No. 77-1 ("Opp'n"); a first-grader allegedly told a guidance counselor that Carraway had pulled a student's pants down and threatened to suspend a group of five students if they did not pee on each other, *id.* at 9–10; and another first-grader allegedly reported to a different teacher that that Carraway had told a group of students to take their clothes off so that he could take a picture and video of them naked, *id.* at 10–11. In March 2015, yet another fifth-grader allegedly told a different teacher that Carraway had hit a special needs student under a table, and that teacher passed the report on to the special education coordinator and to Vice Principal Donna Smith, who in response allegedly instructed the teacher not to leave Carraway alone with a class. *Id.* at 12–13.

In the 2015–2016 school year, in addition to Plaintiff D.W.'s alleged report to counselor Dixon that Carraway had "sucked on [minor Plaintiff's] private part," *id.* at 11–12,  a different

---

[6] For the minor Plaintiffs to show actual notice of Carraway's abuse under Title IX, discussed *infra*, it is not necessary for them to show that they reported their own abuse as it occurred, so long as an "appropriate person" had actual notice of the abuses perpetrated by Carraway against any students predating the abuse of the minor Plaintiffs herein.

fourth-grader reported to yet another teacher that Carraway had made students "do inappropriate touching in a closet in the cafeteria," *id.* at 8. And in December 2015, shortly before allegedly presenting a similar report to Williams, *see infra*, another fifth-grader told the latter teacher that there were "nasty things on Deonte's [Carraway's] phone," *id.* at 4–5.

Crucially, three reports of sexual misconduct by Carraway were purportedly made directly to Principal Williams.[7] Around June 12, 2015 (after at least three alleged reports of sexual misconduct by Carraway had been made to two teachers and a counselor, *see supra*), counselor Dixon informed Williams that he had seen Carraway in the restroom with a fifth-grade student ("June 2015 report"). Williams called the student to her office, where the student indicated that Carraway had given him a flyer for the choir, which was still in the student's pocket. According to the student's deposition, Williams told him, "Don't do that again, because he could have touched you." M.W. Police Int. at 6, 10–11, Ex. 13, ECF No. 77-14. That same afternoon, Williams met with Carraway, and on June 15, 2015, she sent a follow-up email to him recounting their discussion: "During our conversation we discussed the importance of using good judgement [sic] when interacting with students. You were advised to only engage students in conversations in areas that are in plain view of the public. This practice will ensure that actions or conversations that could be deemed inappropriate do not take place." Williams June 2015 Email, Ex. 15, ECF No. 77-16.

---

[7] These three reports are in addition to at least four other alleged complaints to Williams about Carraway's behavior not pertaining specifically to sexual abuse. During the 2015–2016 school year, two teachers expressed concern to Williams that Carraway had been assigned to chaperone the overnight fieldtrip and asked that Carraway not go, but Williams allegedly brushed aside their concern and allowed him to go, Opp'n at 15; a third teacher allegedly told Williams that Carraway regularly entered her classroom and engaged in behavior that was disruptive to her "classroom management," *id.* at 14; a fourth teacher allegedly told the special education coordinator and Williams that Carraway was a "distraction" in her class, *id.* at 15; and a testing coordinator reportedly expressed concern to Williams about Carraway's presence in the school cafeteria, *id.* at 15–16.

Around December 2015, another fifth-grade student allegedly told Williams, "You need to check Deonte's phone. There's nasty things with kids on it." ("December 2015 report"). T.P. Dep. at 40–51, Ex. 10, ECF No. 77-11. There is no evidence that Williams inquired further or took any responsive action, although to be sure Williams denies ever having received this report. *See* Williams Dep. at 266–67, Ex. 1, ECF No. 77-2.

Finally, on February 4, 2016, the grandmother and uncle of another fifth-grade student met with Williams, along with Vice Principal Smith ("February 2016 report"). Opp'n at 18. They showed Williams and Smith a text message chain between the student and Carraway on the student's phone that included profanity and a picture of the student's naked buttocks. *Id.* at 18–19. According to the Board, Williams immediately contacted her supervisor, then located Carraway and told him not to return to school property. First Mot. for Summ. J. at 6 (Mar. 26, 2019), ECF No. 15-1. Williams then called the police, faxed a child abuse form to Child Protective Services, and sent Carraway a "no trespass" letter. *Id.* at 6–7.

The following day, February 5, 2016, Carraway was arrested. Thereafter, he pleaded guilty to dozens of federal and state charges and was sentenced to 75 years in federal prison and 395 concurrent years in state prison.

## II. Discussion

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive)

8

environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). Here, the parties focus their arguments on the third and fourth factors—that is, whether Plaintiffs suffered some adverse educational impact and whether the Board can be held liable for the alleged harm.

In the Fourth Circuit, "[a]n institution can be held liable for a Title IX violation only if [1] an official who has authority to address the alleged discrimination and to institute corrective measures"—i.e., an "appropriate person"—"[2] has actual knowledge of discrimination in the institution's programs and [3] fails adequately to respond or displays deliberate indifference to discrimination." *Id.* at 700 (cleaned up) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). In arguing that it cannot be held liable here, the Board relies almost exclusively on *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), *cert. denied*, 535 U.S. 954 (2002). But after *Jennings* there is a serious question whether *Baynard* still provides the appropriate standard. The claims in *Jennings* pertained to a coach's sexual harassment of players on a university women's soccer team. *See* 482 F.3d at 691–94. In reversing the district court's grant of summary judgment for the university on the Title IX claims, the en banc Fourth Circuit did not look to *Baynard* at all but instead applied a different, seemingly less stringent standard of liability, particularly as to the "appropriate person" element of the claim. *See id.* at 700–01.

District courts in this circuit do not appear to agree on the effect *Jennings* has had on the viability of *Baynard* as good law with respect to Title IX. *Compare, e.g.*, *Doe v. Russell Cty. Sch. Bd.*, No. 16-cv-45, 2017 WL 1374279, at *6 (W.D. Va. Apr. 13, 2017) ("*Jennings* appears to have impliedly overruled *Baynard* by applying a different analysis[.]"), *and Goldstein v. Univ. of Md.*, No. 18-cv-2376, 2019 WL 4467035, at *9 (D. Md. Sept. 17, 2019) ("[*Jennings* and *Baynard*] demonstrate that the question of who has the power to take corrective action is fact-specific and

would be inappropriate for resolution [at the summary judgment stage.]"), *with Doe v. Lenoir-Rhyne Univ.*, No. 18-cv-32, 2018 WL 4101520, at *2 (W.D.N.C. Aug. 28, 2018) (applying *Baynard*), *and Ballinger v. Bd. of Educ.*, No. 15-3769, 2017 WL 6759379, at *5 (D. Md. Dec. 29, 2017) (applying *Baynard* "appropriate person" standard). This Court is persuaded that *Jennings* implicitly overruled *Baynard* as to the Title IX liability analysis, given that the en banc court in *Jennings* did not even give a nod to the *Baynard* standard and that the *Baynard* standard appears far more stringent than the standard for liability recognized by other circuit courts. Nonetheless, the Court considers both *Jennings* and *Baynard* in the following analysis and concludes that the Board is not entitled to summary judgment under either standard.

## A. Appropriate Person

In *Baynard*, the court rested its "appropriate person" analysis almost entirely on the hiring-and-firing authority of the individual who received the harassment reports, whereas the en banc *Jennings* court looked to the relative position and responsibility of the individual within the school setting. In *Jennings*, the court determined that the assistant to the chancellor and counsel to the university was an "appropriate person" because she was the university's "highest ranking lawyer and an official responsible for fielding sexual harassment complaints." 482 F.3d at 700. Plaintiffs here thus contend that, under *Jennings*, the question of whether an official is an "appropriate person" for the purpose of Title IX is fact-based and requires consideration of the school system's structure and administrative policies, including the designation of particular individuals to receive reports of harassment and abuse. *See Goldstein*, 2019 WL 4467035, at *9 (concluding that, under *Jennings* and *Baynard*, "the question of who has the power to take corrective action is fact-specific"). Plaintiffs submit that Williams, as the principal, was the highest-ranking official at Woods Elementary and clearly had an official responsibility to receive sexual harassment

complaints under the Board's administrative policy. *See* Admin. Procedure No. 4170, Ex. 34, ECF No. 56-2.

Without referencing *Jennings*, the Board argues that the "appropriate person" standard under *Baynard* applies—i.e., "whether a supervisory employee may be viewed as the proxy of the school district depends upon whether the district has delegated to that employee the traditional powers of an employer, e.g., the authority to hire and terminate employees." 268 F.3d at 239. In *Baynard*, this standard led to public school principals in Virginia not being "considered the functional equivalent of the school district" because they did not have "the power to hire, fire, transfer, or suspend teachers" under Virginia law. *Id.* The same is true in Maryland: state law "places the power to hire/fire teachers exclusively with the board of education." *Ballinger*, 2017 WL 6759379, at *5 (citing Md. Code Ann., Educ. § 6-202). This power appears to extend to the hiring and firing of nonprofessional staff such as paid aides but not to unpaid volunteers. *See* Md. Code Ann., Educ. § 6-201 (vesting in local superintendents the authority to appoint nonprofessional staff and transfer employees as school needs require).

The Board thus maintains that Williams cannot be an "appropriate person" for Title IX purposes because she lacked the authority to fire Carraway while he was a paid dedicated aide during the 2014–2015 school year. The Board further contends that Williams was not an "appropriate person" because the Board's administrative policies did not give her explicit authority to take corrective measures in response to any complaints (even though those policies clearly designated her as an authority to *receive* complaints), as is required, in the Board's view, under the Supreme Court's opinion in *Gebser*.

Crucially, however, the Board conceded at the February 2020 oral argument that Williams "certainly ha[d] that authority" to dismiss Carraway in 2015–2016, when he "was not an employee

but was rather a volunteer." Oral Arg. at 10:13 (Feb. 19, 2020). Thus, the parties agree that Williams was an "appropriate person" during the 2015–2016 school year. As such, it hardly matters whether she had the authority to fire him the year before; any knowledge she might have gained as to Carraway's behavior during the first year when he was a paid employee necessarily carried over into the second year when he became a volunteer. Williams could not simply close her eyes to knowledge of previous reports as to Carraway's behavior. In other words, as soon as Williams became an "appropriate person" with the authority to take relevant corrective action in the 2015–2016 school year, she had a duty to act on any notice she had previously accumulated regarding Carraway's abusive conduct. The question, then, is whether there is evidence that Williams in fact received notice of Carraway's problematic acts at any point prior to February 4, 2016.[8]

## B.  Actual Notice

Williams allegedly received two direct reports of Carraway's sexually abusive behavior prior to February 2016 that a trier of fact could deem actual notice: the June 2015 report and the December 2015 report.

---

[8] Even if the Board had not conceded that Williams was an "appropriate person" as soon as Carraway became a volunteer, the Court is persuaded that the less stringent *Jennings* standard would apply and establish that she was. *Cf. Doe v. Sch. Bd.*, 604 F.3d 1248, 1256 (11th Cir. 2010) (finding *Baynard*'s higher standard wholly incompatible with *Gebser*, in which the Supreme Court "appeared to presume that the principal could be an appropriate person under Title IX's enforcement scheme" (citing *Gebser*, 524 U.S. at 291)). As to the Board's argument that its policies did not give Williams authority to act on harassment complaints (as required under *Gebser*), the *Jennings* court mentioned this but provided minimal analysis. But the Court still finds that this *Gebser* requirement is implicitly accommodated in the *Jennings* standard. Corrective action can take many forms (not limited to hiring and firing as in *Baynard*) and can include passing the report up the chain of responsibility to the superintendent. *See Doe*, 604 F.3d at 1257 (rejecting contention that "the Supreme Court intended final employment decisions such as suspending, terminating, or reassigning an offending teacher to be the *only* corrective measures giving an official the power to remedy sexual harassment"). For example, there is nothing to suggest that Williams, as principal, could not have limited Carraway's access to classrooms or his apparently unfettered authority to remove students from their classrooms even when he was a paid aide. The Board does not dispute Plaintiffs' assertions that Williams indeed did have and could have exercised that authority.

*1.  June 2015 report*

In June 2015, in response to a counselor's report that he had seen Carraway in the restroom with a fifth-grader, Williams undertook to meet with Carraway and advised him to "only engage students in conversations in areas that are in plain view of the public," in order to avoid "inappropriate" "actions or conversations." Williams June 2015 Email. Williams also spoke with the student and instructed him not to "do that again, because [Carraway] could have touched you." M.W. Police Int. at 10–11.

The Board argues that this report cannot constitute actual notice because, while Carraway was in the bathroom with M.W., Carraway had merely given the student a flyer about the Glenarden choir. But, if that is all Williams was aware of, it does not begin to explain her altogether astonishing response to the incident. Why in the world would she have warned a fifth-grade student against being in a situation where a school staff member "could have touched" him if she did not know or have reason to believe that there was at least a substantial risk that the staff member would do just that? A reasonable trier of fact might well find that Williams knew very well what was going on with Carraway—and it was not merely concern over whether he was passing out flyers about choir rehearsals.[9] Under the circumstances, the June 2015 report may well be deemed actual notice to Williams, in response to which she should have taken corrective action at the very latest by September 2015, when Carraway became a volunteer assistant.

*2.  December 2015 report*

In late 2015, a different fifth grader (not one of the minor Plaintiffs in the present case) allegedly told Williams the same thing she had told a teacher: "You need to check Deonte's phone.

---

[9] And what about what other students supposedly said to their teachers? Did those teachers deliberately decline to talk to Williams about the incidents? Was there a conspiracy of silence, a built-in plausible deniability?

There's nasty things with kids on it." T.P. Dep. at 50–51. Plaintiffs note that this is very similar to the February 2016 report, which moved Williams to finally take action leading to Carraway's arrest, but the Board emphasizes that the February 2016 report involved actual, physical evidence of the abuse as displayed on a child's phone, whereas the December 2015 report did not. The Board also argues that this report of misconduct cannot constitute actual notice because the word "nasty" has many meanings "unrelated to sex."

Setting aside the glaring omission of any follow-up questions by Williams (e.g., "What do you mean by 'nasty things'?")—again, she denies having received this report at all—the Board's argument reads too much into the explicit allegations made in *Baynard*, which included the terms "pedophile" and "sexually molested." The *Baynard* court did not hold that those particular allegations did not constitute actual notice; rather, it held that they were not made to an "appropriate person." Moreover, in the present case, the fact that the student's report lacked explicit details in large part may be fairly attributed to the reporting student's young age and lack of maturity, as well as the obvious awkwardness of the matter. It is entirely reasonable to assume that the child may have lacked the vocabulary or maturity to describe sexually explicit activity as completely as an adult might. The report to Williams, if not detailed, was most certainly direct and highly suggestive. What, Williams might have asked, was this child trying to tell her? After all, this was a report about Carraway's conduct, which in other respects was well known to Williams as highly problematic. Teachers owe students at least a modicum of sensitivity to their complaints.

In sum, putting the December 2015 report in appropriate context, a jury could well find that it constituted actual notice. It came several months after Williams received the June 2015 report—in addition to numerous other complaints of highly inappropriate conduct by Carraway—such that, even if the June 2015 report standing alone did not constitute actual notice, Williams

was at least made aware of a serious potential for misconduct on Carraway's part. An allegation by a child that there were "nasty" things on an unpaid school employee's cellphone, combined with several earlier complaints about that employee's extraordinarily strange behavior, could very well constitute actual notice of sexual harassment or abuse.

### C.  Deliberate Indifference

If actual notice to Williams as an "appropriate person" is established, a factfinder could also fairly conclude that the Board was deliberately indifferent because Williams, acting as the Board's proxy, for too long failed to alter Carraway's status and his essentially unbridled authority at the school or his access to students.

### D.  Adverse Educational Impact

In arguing that Plaintiffs cannot demonstrate that the minors suffered adverse educational impact, the Board relies largely on the fact that Plaintiffs have continued to receive passing grades—a parochial argument at best. The en banc *Jennings* court expressly rejected the argument that improving grades precluded a plaintiff from showing the requisite impact of abusive behavior. *See* 482 F.3d at 699–700 ("If anything, [plaintiff's performance] shows how hard [she] was trying . . . in spite of the hostile environment.").

The Board notes that, in *Davis v. Monroe County Board of Education*, the Supreme Court held that sexual harassment suffered must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. 629, 650 (1999). But the Board ignores significant circumstantial differences: *Davis* involved student-on-student harassment, not teacher-on-student abuse—let alone a teacher's abuse of elementary school students as young as seven years old. The Supreme Court explicitly emphasized that the "relationship between the harasser and the victim necessarily

15

affects" the educational-impact analysis, and "[p]eer harassment, in particular, is less likely to satisfy [educational-impact] requirements than is teacher-student harassment." *Id.* at 653.

In any event, the Court has little difficulty finding that the minor Plaintiffs could meet the *Davis* standard based on the facts alleged: the abuse that Plaintiffs suffered at the hands of an elementary school employee was "so severe, pervasive, and objectively offensive" that a factfinder could determine that it had "'a concrete, negative effect on [their] ability' to participate in a program or activity." *Jennings*, 482 F.3d at 699 (quoting *Davis*, 526 U.S. at 654). *Cf. Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1284 (11th Cir. 2005) (holding that, under *Gebser*, adverse educational impact is presumed for Title IX plaintiffs who suffered teacher-on-student harassment). To be sure, reports from mental health professionals as to the effect of Carraway's predations on the students might strengthen this conclusion. But it defies law and logic to preclude children from testifying, without expert testimony, that they were afraid, intimidated, and upset by what they experienced.

## III. Conclusion

In sum, the Court finds that the Board has failed to demonstrate as a matter of law that Plaintiffs would be unable to prevail on their Title IX claim. The Board's motion for summary judgment is therefore **DENIED** as to the Title IX claim (count IV). A separate order will issue.

Date: January 19, 2021

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE